UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| BRYAN MCINTOSH, | ) | CASE NO. 1:16CV1680 |
|---|---|---|
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| vs. | ) | |
| | ) | |
| GREATER CLEVELAND REGIONAL | ) | OPINION AND ORDER |
| TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

**CHRISTOPHER A. BOYKO, J:**

This matter is before the Court on Defendant Greater Cleveland Regional Transit Authority's ("RTA") Motion for Summary Judgment. (ECF # 34). For the following reasons, the Court denies Defendant's Motion.

**Plaintiff's Amended Complaint**

According to his Amended Complaint, Plaintiff Bryan McIntosh ("McIntosh") was hired by RTA as a Quality Assurance Associate ("QA") in August of 2014. McIntosh is an African-American male and a Muslim. McIntosh was one of four QA's who reported to supervisor Frank Campbell ("Campbell"). The other three QA's were Caucasian. McIntosh alleges Campbell treated him differently than his Caucasian counterparts. McIntosh alleges Campbell required him to submit weekly QA visit forms for the entire time he was under Campbell' supervision. McIntosh contends that either Campbell did not require the visit forms from the Caucasian QA's

at all or did not require the forms from the Caucasian QA's after they had been employed for six months.  Campbell reprimanded McIntosh for QA visit form violations.

Campbell attempted to enforce a strict start time policy with McIntosh even though McIntosh was a salaried employee exempt from a rigid start time under RTA's flex time policy.  Under the flex time policy, exempt employees may start their work days between the hours of 6:00 and 9:00 a.m. so long as they worked a full eight hour day.  In spite of this policy, Campbell reprimanded McIntosh for attendance or tardiness issues.  RTA policy prohibited taking adverse actions against salaried employees for attendance/tardiness issues.  Campbell did not reprimand Caucasian QA's for attendance/tardiness issues.

McIntosh alleges Campbell "spied" on him during work, monitoring him more closely than the Caucasian QA's.  This was noticed by other RTA employees.  Campbell also monitored McIntosh's social media posts, commenting on them at work and even printing one and showing it to others at RTA.  Campbell did not review the social media posts of the Caucasian QA's.

In March of 2015, McIntosh was on a business trip with Campbell when Campbell allegedly made remarks in McIntosh's presence disparaging Muslims.  According to McIntosh, Campbell stated that the "Quran is going to replace the Bible" and that "Muslims are taking over the world and they should all just be nuked and wiped out."  In April of 2015, McIntosh filed a Complaint with the EEOC alleging that Campbell harassed and discriminated against McIntosh based on McIntosh's religion.  McIntosh subsequently amended his EEOC Complaint to add a claim of race discrimination.  On May 7, 2015, RTA and Campbell were notified of the McIntosh Complaint.  Upon being notified of McIntosh's EEOC Complaint, RTA suspended McIntosh the following day based on an unsubstantiated charge and set a pre-termination

hearing. McIntosh had the charge dismissed, returned to work and subsequently filed a retaliation claim with the EEOC against RTA. RTA placed McIntosh on decision-making leave ("DML")which McIntosh contends was the equivalent of a final written warning. McIntosh alleges he had no prior disciplinary actions that would justify such disciplinary action. Thereafter, McIntosh requested a transfer but was denied.

The EEOC investigation found Campbell had trouble communicating with minority employees, many of whom felt disrespected by Campbell. As a result of the investigation, Campbell was required to attend professional development courses.

As part of his job duties, McIntosh was scheduled to go to California to inspect buses that RTA intended to purchase. After denying his transfer, McIntosh contends RTA further retaliated against him by cancelling his California trips, sending three other Quality Assurance representatives to California and placing McIntosh on lower valued work.

McIntosh was required to report to Dan Dietrich in addition to Campbell. McIntosh knew Dietrich and Campbell were friends. Dietrich, as Campbell before him, tried to discipline McIntosh for attendance/tardiness issues but was told by RTA management McIntosh was not subject to discipline for alleged attendance concerns. Dietrich instead assigned McIntosh lower value work. McIntosh contends a Caucasian employee refused to do a specs review job but was not disciplined. Instead, RTA made McIntosh do the job the Caucasian employee refused to do. In September 2015, after another suspension, McIntosh's employment with RTA was terminated for purportedly approving a shipment of brakes without inspecting them. The brakes were either defective or the wrong size. McIntosh asserts the claim was never substantiated. McIntosh alleges retaliation, race and religious discrimination claims under federal and Ohio law.

McIntosh subsequently dismissed with prejudice his religious discrimination claims under federal and Ohio law.

**<u>RTA's Motion for Summary Judgment</u>**

According to RTA, McIntosh was terminated for poor performance, not for any unlawful discriminatory or retaliatory motive. RTA's Motion provides in great detail McIntosh's alleged attendance/tardiness violations. According to RTA, McIntosh was subject to the RTA's flex-time policy. That policy allows employees to choose a start time between 6:00-9:00 a.m. It does not allow employees to come in whenever they choose between those hours on any given day. McIntosh chose a start time of 6:00 a.m. Within the first three weeks he was late five of his first twelve days. Over his one year employment, RTA contends McIntosh was late or absent over fifty times. Within one month of McIntosh's employment, Campbell issued him a written warning for performance and attendance infractions. McIntosh kept pushing his start time later and later and had several discussions with Campbell for his routine tardiness and failure to timely provide weekly visit reports. Campbell assigned McIntosh a project that after one year McIntosh still had failed to complete. Dan Dietrich asked McIntosh why he failed to show up for work on March 23, 2015, without calling in. McIntosh told Dietrich he used it as a comp day, which Dietrich informed McIntosh required prior approval. Campbell issued another written reprimand on April 14, 2015, for McIntosh missing deadlines, McIntosh then filed his EEOC Complaint. On April 30, 2015, before he knew that McIntosh had filed a Complaint with the EEOC against him, Campbell requested that McIntosh be placed on Decision Making Leave ("DML"). A DML is a last chance agreement wherein an employee must meet all the requirements of his or her job for twelve months or face termination. After a meeting between

Campbell, his supervisor and RTA's Labor Relations representatives to discuss placing McIntosh on DML, Labor Relations recommended termination. However, before termination was implemented, RTA learned of McIntosh's EEOC Complaint. On May 8, 2015, RTA suspended McIntosh pending a pre-termination hearing, which was held May 13, 2015. As a result, RTA placed McIntosh on a DML and had him report to Dan Dietrich while McIntosh's EEOC Complaint was investigated. In July 2015, Dietrich reported little or no improvement in McIntosh's performance. In August, Dietrich gave McIntosh a written performance directives memo outlining expectations for McIntosh. Dietrich told McIntosh he was not meeting expectations. McIntosh's attendance and performance issues persisted during Dietrich's supervision of McIntosh. The final straw was McIntosh approved brake kits that video evidence shows he failed to even open, let alone inspect. He was subsequently terminated.

According to RTA, the above attendance and performance issues provided sufficient non-discriminatory and non-retaliatory reasons for McIntosh's termination. RTA argues McIntosh has no direct evidence of discrimination or retaliation. RTA concedes McIntosh may be able to meet his prima facie burden but contends that McIntosh is unable to demonstrate pretext under any of the three accepted methods. Because its reasons for terminating McIntosh relate to his performance and attendance issues and not his race or his engaging in protected activities, RTA is entitled to summary judgment on McIntosh's claims.

**McIntosh's Brief in Opposition**

McIntosh does not assert that he has direct evidence of discrimination, but instead relies on indirect evidence to establish his claims. McIntosh challenges the very basis of his discipline under the RTA flex-time policy which he contends he did not violate. McIntosh describes the

5

policy as "Under RTA's flex time schedule I had to complete eight hours per day. Whether I completed those eight hours starting at 6:00 a.m. in the morning or at 9:00 a.m. in the morning or in between." (McIntosh aff. at para 5). In an interoffice memo dated April 30, 2013 from Joseph Calabrese, CEO of RTA, to all non-bargaining, exempt employees, it reads in pertinent part:

> ...RTA will allow non-bargaining exempt employees to choose, within specified limits of your department and supervisor, the daily hours of work preferred. Thus, employees in a particular department or section may have different starting and finishing times, but will, of course, be required to complete the necesssary (sic) work of their position....
> Also, exempt employees will not be held to the tardy, leave early and occurrence provisions of the attendance Policy should they need to adjust their daily schedule to attend to non-RTA business related concerns.
> Supervisors need to approve any schedule adjustments prior to any employees changing their regularly scheduled hours...

In interpreting this policy, McIntosh argues he understood this to mean he could report on any given day between 6:00 a.m. and 9:00 a.m. so long as he worked eight hours. This understanding was echoed by other RTA employees. Furthermore, McIntosh contends the flex-time policy's plain language says he should not have been disciplined for violating the Attendance Policy, yet his being placed on DML was largely related to his attendance issues. But for being on DML, McIntosh claims he would not have been terminated for failing to inspect brake pads.

McIntosh further contends his fellow Caucasian QA's were not written up for attendance or tardiness violations even though the record shows they incurred a number of such infractions. Also, they were not required to submit weekly visit forms like McIntosh. Furthermore, Campbell's heightened observation of McIntosh and scrutiny of McIntosh's social media posts, which Campbell reportedly found racist, show an animus towards McIntosh based on his race.

RTA placed McIntosh on DML one week after they learned of his EEOC Complaint. According to McIntosh, this proximity in time evidences a retaliatory intent. Finally, RTA concedes McIntosh was replaced by a Caucasian.

## LAW AND ANALYSIS

**Standard of Review**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994); and the court must view the facts and all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with some significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347. This Court does not have the responsibility to search the record *sua sponte* for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n.*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Township Trs.*, 980 F.2d 399, 404-06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); and if the nonmoving party fails to make the necessary showing on an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or

7

whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson*, 477 U.S. at 251-52).

**<u>Race Discrimination</u>**

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination "based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). Moreover, the Ohio Supreme Court holds that federal case law interpreting Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, is applicable to cases involving alleged violations of R.C. Chapter 4112. *Plumbers & Steamfitters Comm. v. Ohio Civil Rights Comm.*, 66 Ohio St.2d 192, 196 (1981). Therefore, the Court will analyze Plaintiff's federal and state claims under the same framework.

"In order to establish a Title VII employment discrimination claim, a plaintiff must either present direct evidence of discrimination or introduce circumstantial evidence that would allow an inference of discriminatory treatment." *Johnson v. Kroger Co.*, 319 F.3d 858, 864-865 (6th Cir. 2003). McIntosh does not offer any direct evidence of discrimination. Instead, he acknowledges the applicability of the evidentiary framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1972) and *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981). (Plaintiff's Memorandum in Opposition, ECF DKT # 37 at 13).

To establish a prima facie case for race-based discrimination in violation of Title VII, a plaintiff must show: "(1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a similarly-situated employee outside the protected class or classes was treated more favorably than he." *Younis v.*

8

*Pinnacle Airlines, Inc.*, 610 F.3d 359, 363 (6th Cir. 2010) (citing *McDonnell Douglas Corp.*, 411 U.S. at 802). A plaintiff may also establish a prima facie claim for race discrimination if after meeting the first three elements he can further show he "was replaced by someone outside of the protected class." *Coffman v. United States Steel Corp.,* 185 F. Supp. 3d 977, 984 (E.D. Mich. 2016) quoting *Griffin v. Finkbeiner*, 689 F.3d 584, 592 (6th Cir. 2012). The burden at the prima facie stage is not an onerous one, and it is easily met. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000).

Upon a prima facie showing of discrimination, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for the employer's actions. *Burdine*, 450 U.S. at 253.

"[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id*. At this stage, "the burden of producing evidence of pretext essentially merges with the burden of persuasion, which always lies with the plaintiff." *Gragg v. Somerset Technical Coll.*, 373 F.3d 763, 768 (6th Cir. 2004) (quoting *Wilkins v. Eaton Corp.*, 790 F.3d 515, 522 (6th Cir. 1986)). A plaintiff may demonstrate pretext by showing that the defendant's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (2003) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

"For purposes of establishing pretext, a plaintiff must show more than a dispute over the facts upon which the [adverse action] is based." *Kumar v. Aldrich Chemical*, 911 F.Supp.2d

9

571, 589 (S.D. Ohio 2012) citing *Abdulnour v. Campbell Soup Co.*, 502 F.3d 496, 502 (6th Cir. 2007). A plaintiff must "put forth evidence which demonstrates that the employer did not 'honestly believe' in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001). So long as an employer honestly believed its proffered reason, an employee cannot show pretext, even if the facts are later shown to be incorrect. *Segel v. Kimberly-Clark Corp.*, 473 F.App'x 416, 421 (6th Cir. 2012); *Smith v. Chrysler Corp.*, 155 F.3d 799, 806 (6th Cir. 1998). "[A]bsent a showing that [Defendants'] 'explanations are inherently suspect' or 'other direct or circumstantial evidence suggesting that the proffered reasons are not true,' summary judgment is appropriate." *Thompson v. Ohio State University*, 639 F.App'x. 333, 341-42 (6th Cir. 2016) (quoting *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 438 (6th Cir. 2002)).

Here, RTA assumes arguendo that McIntosh can meet his prima facie burden, acknowledging he was a member of a protected class, he suffered an adverse employment action-i.e. his termination, he was objectively qualified for the job and he was replaced by a Caucasian male. RTA relies instead on its argument that McIntosh cannot show RTA's reasons for McIntosh's termination were pretextual.

Having conceded for purposes of its Motion that McIntosh can meet his prima facie burden, the burden shifts to RTA to articulate a legitimate, non-discriminatory reason for the adverse employment action. RTA has met its own burden by showing McIntosh was tardy or absent more than fifty times in his year long employment. None of the other QA's had anywhere near that number of infractions. Coupled with McIntosh's failure to timely submit his weekly visit sheets, failure to timely complete assignments and ultimately failure to even inspect brakes

he then approved, all present legitimate nondiscriminatory bases for his termination. See *Imwalle v. Reliance Med. Prod., Inc.,* 515 F.3d 531, 546 (6th Cir. 2008) ("Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment." See also *Harris v. Circuit Court, Clerk's Office, Metro. Nashville,* 21 F. App'x 431, 433 (6th Cir. 2001)( poor attendance record was a legitimate non-discriminatory basis for termination.) Having met its burden, it falls to Plaintiff to establish pretext by one of the three accepted methods- i.e. that Defendant's articulated explanation: "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler,* 317 F.3d at 576.

McIntosh contends there are genuine issues of fact supporting all three bases for showing pretext. Relying on the Kronos time records RTA used to track employee start and end times, McIntosh provides time records for the three Caucasian QA's who also reported to Campbell. These purportedly show infractions by the other QA's that resulted in no discipline. McIntosh further relies on the Kronos time records to show he would show up for work at varying times but still within the three hour flex-time window he contends was permitted under RTA's flex-time policy. This understanding was shared by fellow RTA employee Glenville Manning (Manning depo. pg. 24-25):

> Q. So your start time as you understood it was 6:00 to 9:00 am whenever you get in between that time as long as you—obviously, if you get in later, you are working later in the day?
>
> A. Correct.

John Merriweather, another RTA employee testified on deposition as follows:

Q. All right. So if on Tuesday you learn that on Wednesday there is going to be a meeting that starts at 3:30, then you would just start your day later on Wednesday?

A. Right, right.

Q. And is it just you would start your day just to ensure that you are still getting those eight hours?

A. Right.

Q. Have you heard the term *flex time* or *flex schedule?*

A. Yes, I have.

Q. What is that? Explain that to me.

MS. MINAHAN : Objection. Go ahead.

A. It is when you have a different work schedule. Some people have flex time starting at 10:00, and some people have it at 7:00. But it is never the same time, it is flexible.

Q. Have you always understood that your schedule is flexible, if need be, for you?

A. Yeah, that is the way I work.

RTA argues these employees did not report to Campbell and worked in different departments than McIntosh so the testimony is not relevant, yet the flex-time policy covers all exempt employees and is not limited to QA's. Therefore, the Court finds the above testimony and flex-time policy competent evidence of RTA's flex-time policy as understood by its employees. As such, it raises an issue of fact whether McIntosh's reporting to work at varying

times, so long as it was within the 6:00 a.m.- 9:00 a.m. window, was in violation of the RTA Attendance Policy.

Furthermore, McIntosh contends the RTA flex policy prohibits discipline of exempt employees for tardiness or leave issues. The Policy clearly states exempt employees "will not be held to the tardy, leave early and occurrence provisions of the Attendance Policy should they need to adjust their daily schedule to attend non-RTA business related concerns." A plain reading of the language indicates that McIntosh's interpretation is plausible from the ambiguous terminology concerning "non-RTA business related concerns." McIntosh's interpretation is supported by the deposition testimony of Bruce Hampton, Deputy General Manager of Human Resources at RTA, who testified:

> Q. And the information you had available to you, was that simply from the documentation you had, or were you talking to employees, as well, and getting additional information?
> 
> A. I don't remember if I talked to anybody or not.
> 
> Q. Now, when you say some of the discipline was appropriate, which you also say in your e-mail, did you find that some of the discipline was not appropriate?
> 
> A. Yes.
> 
> Q. Tell me which discipline you found that was not appropriate that was given to Mr . Mcintosh.
> 
> A. I believe there were some write-ups for being late, and I didn't find that to be appropriate.
> 
> Q. Why did you find that to be inappropriate?

A. Well, because Mr. McIntosh, as I recall, was a non-bargaining exempt employee, exempt under the Federal Labor Standards Act, and was not subject to the tardies and the absence policy that we have here.

Q. So you believe that for any discipline regarding tardies or absences-related issues for Mr. McIntosh, that he should not have been written up because he was not subject to the policy that would have allowed him to be written up for that?

A. That's correct.

(Hampton depo. pgs. 17-18)

The parties spend additional time contesting whether McIntosh was held to a stricter time reporting standard than the Caucasian QA's under Campbell. McIntosh points to time records showing the other QA's reported at different times on different days or clocked in hours late but were never written up for doing so. RTA responds that those employees either did not report more than thirty minutes late as McIntosh repeatedly did, or they used vacation time to cover the late start time. Regardless of whether there was disparate treatment in punishing employees for arriving more than thirty minutes outside their scheduled start time, the Court finds that whether McIntosh was even subject to discipline for his late arrivals is a question of fact for the jury. Since most, if not all of McIntosh's reprimands, including his placement on DML, stem largely from his attendance issues, the jury must determine whether under RTA's own policy he was subject to discipline and, if not, by inference whether this was pretext for unlawful discrimination.

Similarly, it is undisputed that McIntosh was required to submit weekly visit forms for a longer period of time than his Caucasian QA coworkers. RTA alleges it was due to McIntosh's

14

poor performance, but that poor assessment of his performance was due at least in part to his attendance issues. Similarly, while he was terminated for failing to inspect defective brakes, the termination was the result of his being placed on DML. His placement on DML was based in large part on his attendance issues. Because this is a genuine issue of fact on whether his conduct merited discipline under the RTA Attendance Policy, McIntosh has met his burden creating an issue of fact on pretext.

Therefore, for the foregoing reasons the Court denies RTA's Motion for Summary Judgment on McIntosh's race discrimination claims.

**Retaliation**

Title VII prohibits an employer from retaliating against an employee who has opposed discriminatory conduct or filed " a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." In *Nguyen* v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000), the Sixth Circuit articulated the standard a plaintiff must meet to establish a prima facie retaliation case:

> [A] plaintiff must establish that: (1) she engaged in activity protected by Title VII; (2) the exercise of her civil rights was known to the defendant; (3) thereafter, the defendant took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action.

"Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation." *Mickey v. Zeidler Tool & Die Co.,* 516 F.3d 516, 525 (6th Cir. 2008). However, *see Cooper v. City of North Olmsted*, 795 F.2d 1265 (6th Cir. 1986) (temporal proximity period of

15

four months did not support prima facie inference of retaliation); *see also Matricardi v. Astro Shapes, Inc.* 2007 WL 2902918, 14 (N.D.Ohio, 2007) (plaintiff failed to satisfy prima facie burden of retaliation when temporal proximity period of four months absent other evidence). "In this circuit, a period of more than four months was found to be too long to support an inference of causation." *Imwalle v. Reliance Medical Products, Inc.*, 515 F.3d 531, 550 (6th Cir. 2008). "Specifically, the more time that elapses between the protected activity and the adverse employment action, the more the plaintiff must supplement [her] claim with 'other evidence of retaliatory conduct to establish causality.'" *Vereecke v. Huron Valley Sch. Dist*., 609 F.3d 392, 400 (6th Cir. 2010).

"To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action." *Nguyen*, 229 F.3d at 563. Evidence that the City treated McIntosh differently from similarly situated employees is relevant to causation.

The parties do not dispute that McIntosh can satisfy his prima facie burden to show he engaged in a protected activity with the knowledge of RTA. McIntosh filed his EEOC Complaint in April of 2015. RTA became aware of the filing, at the latest, on May 7, 2015. The next day RTA suspended McIntosh pending a pre-termination hearing, which was held on May 13, 2015. The hearing resulted in McIntosh being placed on DML.

The parties dispute whether McIntosh suffered an adverse employment action temporally close in time to RTA's learning of McIntosh's EEOC filing. Under Sixth Circuit precedent, "An adverse employment action 'constitutes a significant change in employment status, such as

16

hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). "Facing heightened scrutiny, receiving frequent reprimands for breaking selectively enforced policies, being disciplined more harshly than similarly situated peers, and forced to attend a pre-determination hearing based on unfounded allegations of wrongdoing might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Laster*, 746 F.3d at 732.

The Court finds McIntosh has met his prima facie burden showing an adverse employment action. *See Michael v. Caterpiller Financial Services Corp.*, 496 F.3d 584, (6th Cir. 2007)(holding that placing employee on brief paid administrative leave and 90–day performance plan meet "relatively low bar" of materially adverse action for purpose of retaliation claim.) Setting a pre-termination hearing and placing McIntosh on DML within days of learning of his Complaint was sufficiently close in time to satisfy his prima facie showing a causal connection. This is coupled with his showing, as discussed previously, that he was reprimanded for violating a policy that the jury may find he was not subject to discipline for violating.

Again, for the same reasons, RTA can meet its burden of articulating a non-retaliatory reason for the adverse action. But for the reasons described in the Court's determination on race discrimination, McIntosh has presented sufficient evidence of pretext concerning being placed on a DML for attendance violations and performance issues to defeat summary judgment.

There is another issue for the jury concerning McIntosh's termination. According to RTA, McIntosh was subject to termination based solely upon his failure to inspect brakes under

17

RTA disciplinary policy. However, McIntosh's termination letter states, "Since you are on an active DML, termination is warranted." It further states, "Based upon the information and evidence provided, it is this Hearing Officer's opinion that the failure to conduct a proper QA inspection warrants formal discipline. Given that you are currently on a DML, the decision to terminate your employment with GCRTA is substantiated..." (RTA termination letter Sept. 29, 2015 at ECF # 32-14). Thus, the reason RTA gave McIntosh for his termination was due to his violation while on a DML. Because his DML status is subject to disputed facts, the Court finds RTA is not entitled to summary judgment on McIntosh's retaliation claims.

Therefore, for the foregoing reasons, the Court denies RTA's Motion for Summary Judgment.

IT IS SO ORDERED.

s/ Christopher A. Boyko
CHRISTOPHER A. BOYKO
United States District Judge

Dated: March 22, 2018